Company, number 516038. May it please the Court, my name is Edward Sebchak and I represent the plaintiff appellant Paul Bergman in this case. The sole issue we have raised on appeal involves the sufficiency of the evidence which resulted in a jury verdict in favor of a defendant. This case was brought under the Federal Employer's Liability Act for Mr. Bergman's injuries which he suffered in the course of his employment with the railroad. Under the FBLA, the standard of proof is relaxed and what Mr. Bergman was required to prove in order to prevail in this case was simply that some negligence on the part of the railroad, however small, was a cause of his injury. That's a much relaxed standard as compared to the common law rule of negligence. Now, this case was tried before a jury and we lost it. So we're appealing the jury's verdict. So at this point, what the issue is presented to this Court is, was the jury's verdict that no evidence on the part of the railroad, however slight, was a cause of the plaintiff's act injuries against the manifest wit of the evidence? And we think it was. Much of the evidence... But isn't that really believable evidence, what they thought? You can present evidence, but does it have to be something that is connected? Well, I agree with that, Your Honor. But you didn't say that. That's what I'm getting at. Okay. I'm sorry. I'm not following what your question is, Your Honor. Well, you just can't say you can't put evidence and say that's the evidence. There has to be evidence, but it has to be connected. Well, I agree with that, Your Honor. If that isn't stated properly, I apologize. It's a problem. We certainly have relevant evidence on the issue of liability. That's right. Relevancy, basically. At any rate, much of the evidence on the issue of liability was really undisputed at trial. Much of the trial revolved around the responsibilities of the yardmaster in a railroad. The yardmaster involved in this case was a man named Tom Waldman. It was undisputed at trial that the yardmaster's job is akin to being an air traffic controller. The yardmaster controls all of the movement within this yard on this side of the yard. There were two sides to this yard. One was that Tom Waldman was what was called a bull yardmaster. On the other side of the yard is what's called a crest yardmaster. On the western side of that yard, Mr. Waldman was to control all the movement. Nothing was supposed to move in that yard without his authorization and his order. The Railroad Zone rules further made it clear that Mr. Waldman was responsible for the work of the yard crews. Mr. Breedman was a member of a yard crew working out there that night. The evidence was undisputed that Mr. Waldman, within minutes of each other, first authorized an ongoing Union Pacific train to depart the yard, which required that train to take a path out of the yard, which would take him through what's called a diamond crossing, or crossing a grave. Mr. Waldman then turned around and instructed Mr. Breedman, who was operating what's called a light power, in other words an engine with no cars attached to it, and he was doing yard work, instructed him then to go around to Two Pocket for lunch, knowing that he was telling Breedman to take his train and go on a route on the tracks to Two Pocket, which required him, on a different track, to go through that same crossing at grave that he had just told the Union Pacific train to go through. So it's undisputed that Mr. Waldman created a hazardous condition. He created a situation where there was conflicting movement in the yard. He sent these two trains to converge on the same common spot, and he didn't warn either one of them about what was going on with the other. So that was all undisputed. Mr. Waldman testified that when he receives an instruction like that from a yardmaster, he can assume that he has a clear route. In other words, he can assume that there is not going to be any other conflicting traffic in the yard. So he proceeds toward this crossing at grave on what's called the Cottonbelt Horn. Meanwhile, the Union Pacific train was actually going through that intersection on the Bealy Horn, which is another track. Now, through a perfect storm of circumstances, Mr. Bridgman did not see this train going through the crossing. Mr. Bridgman was an experienced railroader. He had worked at that yard for many years. But it just so happened that when he was approaching the crossing where this Union Pacific train was going through, it was dark, it was at night, that there were cars on this train called articulated well cars, which are low-lying cars, and they were empty. So it's not like there were big boxcars going through at this time. There were low-lying cars going through, and the beam of Mr. Bridgman's headlight actually went over the top of the cars and then went through beyond the crossing, which gave him the impression that the crossing was clear. So when he then realized that there was a train going through, and when he saw a bulkhead of a boxcar or some tall car going through, he applied the brakes, but was unable to stop. There was a collision. His car derailed over on its side, and he was trapped inside. You mentioned the light. Is there some kind of a rule on lights? There was a rule. High beam, low beam? Well, that was a disputed question at trial, Your Honor. Mr. Bridgman had his headlight on, but he had it on low beam, and his interpretation of the rules was that you're supposed to keep your headlight on low beam because you didn't want to blind other crews working in the yard. The railroad contended that they had changed the rule and that he was permitted to use his high beams. Was he permitted or forced to? I mean, was that the rule? He had to use high beam? I think it would be within his discretion to use the high beam or not. So anyway, this collision occurs, and if you look at what was done here, it seems this crossing at grade had no signals on it, no stop signs, although there were stop signs at another crossing at grade in a different part of the yard. But the railroad here had chosen not to put any stop signs, not to put any signals of any kind, and it was a completely open crossing, which means that a lot of times you have to throw a switch to line up the tracks. Here it was just like driving on the street or something. Trains could go through both directions on one track or both directions on the other track without having to do anything. So in effect, the railroad was putting the control of that intersection in the hands of the yardmaster. And once again, the yardmaster did not do his job properly. He should have warned Mr. Bergman that he had permitted this UP train to go out and told him to watch for it. Since Walnut didn't say anything about it, Bergman, I don't know, perhaps was lulled into a little bit of a false sense of security because when the yardmaster gives you an instruction like that, you can assume that you have a clear route and that there's no conflicting traffic. Now, in this case, I would concede that there was evidence of contributory fault on the part of Mr. Bergman. I think that was a jury question. But I think it was against the manifest way of the evidence for the jury to decide that no negligence on the part of the railroad, however slight, was also a cause of this accident. This accident would never have happened if Mr. Wallman had done his job properly. Mr. Wallman was an employee of the railroad. The railroad was responsible for his conduct. So I think it's clear that the jury, in this case, decided improperly. That happens every once in a while. And I think it was egregious enough here that the court should order a new trial on all issues. Now, there were some additional facts, although some of them were disputed. One was that back in 2006, which was about five years before our accident, the same yardmaster, Tom Wallman, caused another collision, a sideswept type collision, in that same yard when, once again, he didn't want a yard crew of a conflicting movement of an outgoing train. It was a very similar situation to ours. And that happened five years before our accident. There was testimony in the case. Against the jury. The jury heard that. It did. And I concede that part was conflicting to a certain extent. There was no question that the collision occurred and that Wallman didn't want a crew. The conflicting evidence was that when they had an investigation of that earlier accident, Steve Augustine, who was Wallman's superior, testified at this investigation, and it was under oath, that he talked to Wallman and he said, you've got to start warning these crews about conflicting movements. Well, Wallman denied he was ever told that, and so that's where the dispute lies. Now, there's also evidence that after our accident happened, Wallman admitted that he was at fault in the accident to another railroad employee named Mike White, but once again, that was conflicting and that was for the jury to decide, I think, because, of course, Wallman denied that he ever said that. So, your honors, if you look at the evidence on the whole, I don't think there's any way you can conclude rationally or with the weight of the evidence that the railroad's negligence was not a cause, however small, of this accident. And for that reason, your honors, I think that the plaintiff is entitled to a new trial on all issues. Thank you, counsel. Thank you. May it please the court. Counsel. Carl M. Harloth with the Albany Southern Railway Company. The problem with the argument that we just heard, your honors, is that it was Mr. Subcheck's closing argument to the jury, and all of the evidence that he just presented to you, it was disputed, and we put on evidence that refuted every one of the points that Mr. Subcheck just made to you and more points that he didn't. Everything was disputed. Mr. Wallman, the yardmaster, was not an air traffic controller. There was testimony by a Mr. Penworthy that indicated absolutely not. This is not where we have conflicting runways where airplanes are going 100 miles an hour. We have a railroad yard with 90 miles of track, 300 switches, and the maximum speed is 10 miles an hour. That was disputed. We also disputed that Mr. Wallman had to warn Mr. Bridman about this conflicting track. We presented to the jury the radio transmissions that were made that night, and the timeline is in our brief. But about 5 o'clock that evening, the yardmaster told Mr. Bridman and his co-worker that they were to keep the crossovers clear. He didn't tell them why because Mr. Bridman knew why. He had worked since 1996 on second shift on the same job he was working on the night of this accident. The only train that used that track was the outbound MASPB. And its scheduled time to leave was 8 o'clock. And it was the only train that would use that track for the entire shift. We put on evidence to show that Mr. Bridman took a cut of cars and was on perimeter track 3, the track right next to the southbound train. He went right by it. And at 7 o'clock he told his co-worker who was on the other end of the yard, the west end of the yard, make sure you clear these crossovers because the train on number 4 has to go south. That's the train involved in this collision. Mr. Bridman knew it was going to leave that track and it was right next to it. He was on track 3. His train was right next to him. Were they going in the same direction or different directions? The train that was leaving was going south, actually southwest. Mr. Bridman took his cut of cars and went east by the whole track. He went right by it with his switch deck. So this fact you heard, it was undisputed or that Plaintiff could assume he had a clear route. That was disputed. Every issue was disputed. And we put on evidence of the rules that Mr. Bridman violated. The first one was Rule 6.28. You have to be able to stop within half your range of vision. Mr. Penbridley, the supervisor that went out immediately after this collision, and I'll get to what he saw on these reflectorized cars, but he testified, obviously, Mr. Bridman violated that rule. Mr. Penbridley testified, I operated these two engines that Mr. Bridman was on that night. You can stop those engines within 60 feet. Mr. Bridman and his expert, the liability expert, Mr. Hines, they both testified that with the low beam dim light, you can see 400 feet in front of the engines. Mr. Hines said with the headlight on bright, you can see 800 feet. Mr. Subcheck told the court here it was undisputed that this was a dark area and you couldn't see them. We put on testimony of Colonel Hart, who was a police officer for the Almond Seller. And he was actually watching the southbound train leave. The yard was in East St. Louis. Part of his duty was to watch the train leave, no vandalism. His car was actually located further away from this railroad crossing than Mr. Bridman. And he not only saw the outbound train at the railroad crossing, he saw the train leaving track four in the perimeter yard further away. And the reason why he could see that is because to the east of where Mr. Hart was, that's the yard that Mr. Bridman came out of, the Cotton Belt yard, and it's lit up like a Christmas tree with the lights. And the lights, they don't just stay there. They shine over where this railroad crossing was, where the collision occurred. He had no problem with that. So all of these things, in fact, the lighting issue, there was testimony that there never had been any complaints about lighting at the diamond. They, in fact, received compliments of the stadium lighting that was put in before this accident. We put out evidence that at the beginning of every shift, all the employees, the transportation employees are brought in, and they have a safety meeting. And they go over issues that have come up, and they always go over operating rules, safety rules. And they get paid for that, 15 to 30 minutes every start of shift. We went and put out evidence of the sign issues that Mr. Bridman signed off on. Rule 6.28, I believe that was went over eight times in the year of 2010, the year before this accident in January of 2011. That's the stopping within half your vision. The other rules that Mr. Bridman broke, Rule 6.16, that says when you come to a railroad junction, a railroad crossing, be prepared to stop. That is undisputed. This was a railroad crossing, and it's undisputed that Mr. Bridman did not stop. And, in fact, he was not prepared to stop. There was testimony if Mr. Bridman had complied with that rule, this accident would not have happened. The headlight rule, Rule 5.9.1. Your Honor asked whether there was any dispute about that being in effect on the night of this accident. Undisputed testimony, Mr. Bridman finally admitted it was in effect. It had been changed over a year before this accident. We presented the signing sheet where that rule was gone over with Mr. Bridman before this accident. We also presented evidence. The out-of-bound train has an event recorder that records time, distance, and speed. The switch engines that Mr. Bridman was operating also had an event recorder. We presented evidence to the jury from the point of the collision, backwards in time, to show where Mr. Bridman would be as he approached this area where the collision occurred. And that showed when he was in the Cotton Bell Garage, that has all the lights and it's lit up literally like the Christmas tree. That's where the stadium lighting was put. Mr. Bridman turned on his headlight to bright and for some unknown reason turned it off. And there is no discretion with that rule, Your Honor. It says you will have it on unless another crew, you've come up to another crew, asked you to turn it off. Mr. Bridman testified that no crew asked him to turn his headlight off. Mr. Bridman testified there were no crews in any of the areas where he went through that Cotton Bell Yard or up to the point of this collision. He mentioned signals at this crossing. We put on testimony as to why there was a stop sign on the other end of the yard. That was because that went to all of those facilities in the Cahokia there. Those employees there are not railroad employees. They're not certified under the rules. They are not FRA trained or licensed. And the union representatives of the Alt and Southern on their safety committee, they were the ones that asked for the stop sign there. And the FRA, the Federal Railroad Administration, they told us to put locks on the switches so those employees could not come into the yard. That was over a mile and a half away on the east end of the yard or on the west end of the yard. Your Honors, we have listed in our brief all of the references by plaintiff's counsel and Judge Gleason from the motions in the limine that I filed that were denied because they were questions of fact. Plaintiff's counsel made that argument. Judge Gleason agreed. We've cited in our brief the record. At the end of Plaintiff's case, my motion for directed verdict, plaintiff's counsel said, these are all questions of fact. Judge Gleason agreed. At the end of all the evidence, plaintiff's counsel was, again, questions of fact. We have put on evidence by both parties on all of the issues. Judge Gleason agreed. And we have quoted at the post-trial motion where Judge Gleason indicated that these were all questions of fact. The argument that plaintiff's counsel is making in this appeal is, under the FDLA, you have the causation in whole or in part. The argument we're hearing here is, as long as I put on any evidence, I should win. And if the jury decides otherwise, it's against the manifest way of evidence. That is not the law. It hasn't been the law ever since the FDLA was created. We've cited the cases from this court and the Supreme Court that says, as long as there's an evidentiary basis for the verdict, that's the end of the story. Your Honors, no, it's not you to re-judge the credibility of the witnesses. That's the jury's job. And we presented evidence to refute every point that you heard today. And if you look at our brief, we outlined all of the evidentiary basis that we put on to refute everything that was presented. The job briefing. The warning was unnecessary. Plaintiff knew about not only the diamond, but the train leaving. The violations of all three of those rules. There was testimony that if the plaintiff followed those rules, this wouldn't have happened. Everything is a question of fact. The jury decided that the plaintiff knew the train was leaving. He knew where it was at. For whatever reason, he should have seen it. Colonel Harp saw the fact that this headlight goes over the cars. There was testimony by witnesses that said, that's not hard to see. And in fact, I forgot to mention the reflectorized railcars. That's why Colonel Harp, who's even further away from the plaintiff, he not only saw these cars at the crossing, the rail crossing, where the tracks are. He saw them beyond that. And the reason is the Federal Railroad Administration puts out regulations, which are the law, that reflectorized markings have to be on these railcars. And Colonel Harp testified, that's how I saw that train coming out of the perimeter yard, going across that crossing. Mr. Penworthy, I forgot to mention this, he was out there immediately after it was happening. He testified that he saw these reflectorized markings on the cars before it was articulated cars. And also, most importantly, on these articulated cars, which are lower to the ground, rather than the boxcars. And so, if Colonel Harp saw that, certainly the plaintiff should have saw it. And that's what the jury decided. The jury went down, they saw this evidence. Whatever the plaintiff put on, the defense put on evidence to refute it. And that's the jury's job. It's not the job of the trial court in a motion for a new trial to say, well, yeah, plaintiff, you put on some evidence, so I'm going to give you a new trial. That's not the standard. It's against the manifest way of evidence. And the law is, if there's any evidentiary basis to support that verdict, that's the end of the analysis. And I submit to you, Your Honor, if you look at our brief at the end there, where we have put down the evidentiary basis that we put down, it not only supports the verdict, but I submit to you the manifest way of evidence in this case was put on by the defense. You heard here the perfect storm with these low articulated cars, and that somehow was Mr. Bridgman's excuse at trial for not seeing and having this collision occur. It's in the record what was argued was this was an optical illusion. Yet Mr. Bridgman, he's saying he could not see this train going across this track. Yet he could see 228 feet beyond that of a target for a switch that's on the ground. He could see that because there was reflectorized paint on that target. Your Honor, the jury did not buy the evidence Mr. Bridgman put on to trial. And that was their job. They decided that Mr. Bridgman did not need to be warned about that outbound train because he knew about it. He should have seen it. Colonel Hart saw it. There's no reason why he shouldn't have done that. The jury decided that he violated the rules. And so we would ask that the appeal or the granting of a new trial be denied. Thank you. All right. Thank you, counsel. I have one question. Yes, Your Honor. Are there cameras on the front? Are they photographing? Are there movie cameras on the front of the train on these? Not at this time. Not at this time. Okay. There's no evidence of that. There were none as far as I know. Okay. I did not argue for any such standard as opposing counsel came up with in his argument. In this case, it's not just some evidence. And in this case, we have, once again, uncontradicted evidence that the yardmaster, whether you want to call him an air traffic controller or how you want to characterize him, he was in charge of all the movement in the yard. Nobody moved without his authorization of his order. It was undisputed that he sent this outgoing Union Pacific train on a route that went through that crossing. It was undisputed he sent Mr. Bergman on a different track on a route heading toward that same common location. So he sent these two trains hurling toward each other to a common meeting point without warning either of them that that was occurring. I think that is the evidence that's undisputed that should entitle us to a new trial, Your Honors, because if that had not happened that way, this actually would not have happened regardless of all the other human factors, not seeing a train, all the rest of those things came into play only because Mr. Waltman set the whole thing into operation to begin with. And I think that that is sufficient to entitle us to a new trial in this case. Thank you. Thank you. Thank you, Counsel. We take this matter under advisement and render a decision in court.